Troy, Paul E., J.
INTRODUCTION
The consolidated actions were called for trial on Monday, November 7, 2005. On that date, all parties waived their right to a jury. Thereafter, a jury-waived trial was held before this court on November 7, 8, 10, and 14, 2005.
The law suit resulted from damages caused by a fire at the Merchants Row Market Place Mall (“Mall”) in Hanover, Massachusetts on August 10, 1999. The fact of the fire is not an issue, but its cause is disputed. As a result of the fire, the Mali’s landlord, defendant Williamsburg Company, Inc. (“Williamsburg”), and several commercial tenants sustained property damage. All damaged parties filed claims with their respective insurers. The claims were paid and the insurers brought these consolidated actions.
During the course of the trial Louise Alibrandi, George P. Williams, John D. Malcolm, John R. Allen, James Gallagher, Richard Fain, Michael Down, Thomas Klem, and Daniel Slovich testified in person. In addition, excerpts from the depositions of Michael P. Gilligan, Theresa Webb, Susan Stella, Christopher Gallo, George D. Williams, and William Timmons were read. Some twenty-one exhibits were also entered into evidence, including photographs of the fire scene, diagrams, reports of experts, and the toaster oven and fluorescent light fixture removed from the room where the fire originated.
DISCUSSION AND FINDINGS
Based upon the testimony of the witnesses, the exhibits, and the stipulations of the parties at the trial, the court finds the following evidence to be credible.
On the morning of August 10, 1999, at approximately 9:10 a.m., a fire was detected at the Mall. On this date, Williamsburg was the owner of the Mall. *512 George D. Williams, (“Williams”) a licensed construction supervisor in Massachusetts, is the principal of Williamsburg. Williamsburg developed the Mall in or around 1986. One of the Mall’s original commercial tenants was defendant, Face Place, Inc., whose principal was Louise Alibrandi (“Alibrandi”). Face Place, Inc. operates The Face Place (“Face Place”), a beauty salon that provides facials, make-up, nails, waxing and massages to its customers. The Face Place was located in the basement of the Mall’s three-story premises. The layout of The Face Place was designed on graph paper by Alibrandi, but was built as a “turnkey” tenancy with Williamsburg acting as the general contractor. Alibrandi’s only responsibility during the construction of the tenancy in 1986 was finish work and decorating.
In 1990 or 1991, The Face Place underwent a five-room build-out (“build-out”) of its space that included construction of a small, irregularly shaped room described as a “break room.” No party has documentary evidence of exactly when the build-out took place or was completed. The design for the build-out was created by Alibrandi, but Williams retained control over the construction. Alibrandi paid Williams-burg six thousand dollars toward construction costs in order to avoid a large rent increase.
All of the build-out rooms contained electrical work. Electrical outlets and one light switch were installed in the break room, along with a four-foot, 2-bulb, fluorescent light fixture which was located in the concealed space above the suspended ceiling (“fluorescent light fixture”). The fluorescent light fixture was installed in the middle of the ceiling.
The fire originated in the break room of this build-out. When firefighters arrived at the Mall around 9:30 a.m., they detected a light haze within the basement area. With the aid of a thermal imaging camera, firefighters entered The Face Place and first detected heat in the form of warm water flowing down a hallway. The firefighters advanced into the hallway and ultimately into the break room. When the firefighters entered the break room, the thermal imaging camera detected heat from the concealed space above the suspended ceiling of the break room. The thermal imaging camera did not detect a source of heat from anywhere else in the room. Significantly, the thermal imaging camera did not detect any heat source from the counter area of the break room where a small Black & Decker toaster oven (“toaster oven”) was located. Neither did the thermal imaging camera detect heat from the wooden cubicles and shelves located directly above the toaster oven.
Initial attempts to suppress the fire were abandoned when electrical arcing resulted from the spray of water into the room. After a delay, electrical service to the mall was shut off and the fire was ultimately suppressed when firefighters broke into the ceiling of the break room from the floor above.
A. The Origin and Cause of the Fire
Almost immediately following the fire, the investigation of its cause and origin commenced. At trial, much of the evidence focused on two competing theories as to the origin of the fire. The insurers of the commercial tenants, as well as WJT, Inc., d/b/a Lightning Laundiy (“Lightning Laundiy”) and The Face Place (all collectively referred to herein as “commercial tenants”) allege that the fire originated in the area of the fluorescent light fixture in the break room. In contrast, the insurer of Williamsburg, as well as Williamsburg and Williams' (all collectively referred to herein as “Williamsburg”) agree that the fire started in the break room, but contends that it originated from the toaster oven and not from the fluorescent light fixture.
With regard to the cause of the fire, the theories are also diverse. The commercial tenants allege that the fluorescent light fixture was improperly installed and incorrectly attached with diywall screws along a ceiling joist. Williamsburg, however, alleges that an employee of The Face Place’s laundiy service negligently and unwittingly activated the toaster oven which led to the fire.
1. The Toaster Oven Theory
Michael Gilligan (“Gilligan”) testified that he was employed by Lightning Laundiy as a deliveiy person during the summer of 1999. William Timmons (“Timmons”) the president of Lightning Laundiy, instructed Gilligan as to the route to be followed to collect and dispense linens and the locations within each business or residence where collection and deliveiy took place. Gilligan routinely delivered linens to The Face Place in the morning before the business opened by using a key provided by The Face Place. Gilligan was instructed by Timmons to deliver the linens to the break room and he would place them on the floor to the right of the entrance to the room. He said that although it was possible that he placed the linens on the counter on the day of the fire, he had no recollection of having done this. Gilligan said that he entered The Face Place at about 8:30 a.m. on the morning of the fire. He briefly turned on the overhead fluorescent light in the break room and turned it off when he left. He did not smell any smoke or notice anything unusual at that time.
There was conflicting evidence concerning the operability of the toaster oven. Alibrandi testified that before the fire, the oven portion worked fine, but the toaster oven would not make toast unless the activation arm which operated the toaster component of the toaster oven was held down.
Williamsburg called John Malcolm (“Malcolm”) as an expert witness at trial. Malcolm, who has been a certified fire investigator since 1991, and has conducted some fifteen hundred fire-related investigations, opined that the fire did not originate in the fluorescent light fixture. His reasons included that the fluorescent light fixture would have had a “P” (protected) ballast and installing a fixture with a “P” ballast *513 along a beam is not improper or against the electrical code. Instead, Malcolm testified that the fire originated at the toaster oven. In his opinion, Gilligan placed the plastic bag of towels against the toaster oven, and the weight of the plastic bag of towels depressed and held down the toaster oven’s activation arm. Malcolm based his opinion, in part, on photographs of the scene after the fire which showed a bundle of laundry against the front of the toaster oven, and a “V” pattern of burning which had its narrowest point behind the toaster oven, and other evidence of the fire’s burn pattern. Malcolm testified that the toaster oven has an internal thermostat which should prevent it from heating to over 500 degrees. However, if the internal thermostat were broken, the temperature could go higher. He determined that the heat in the toaster oven did go substantially higher because the plastic shelf on the top of the toaster oven melted and the toaster oven’s high temperature glass broke; the shelf above the toaster oven burned; and, part of the toaster oven’s cord was melted and charred. According to Malcolm, this extreme heat caused the bundle of towels to catch fire. Then, the fire spread to the shelves above the toaster oven and jumped from the edges of the shelves into the open lattice work grille below the fluorescent light fixture.
Malcolm was not retained as an expert until over a year after the fire. He never visited the site and because the toaster oven was badly burned, he could not test it. Instead, he purchased a toaster oven similar to the one in the break room and explored its operation. However, he did not conduct testing on that model to determine the temperatures which could be reached by the toaster oven or the external temperature created if the activation arm were held in the on position.
The commercial tenants called four expert witnesses.[2] Each of these experts disagreed with Malcolm’s opinion that the toaster oven was the cause of the fire. Like Malcolm, each of these experts was highly qualified in the field of fire investigation. They included Captain James Gallagher of the Hanover Fire Department, a certified fire investigator who has investigated over seventy-five fires of questionable origin; Richard Fain, a forensic electrical engineer who has given expert testimony in all the New England states; Michael Dorn, a retired trooper with the Fire Marshal’s Office who has investigated about fifteen hundred fires; and Thomas Klem, who has testified as a fire investigation expert witness some seventy times. Each of these witnesses opined that the fire did not start at the toaster oven. Instead, they opined that the fire started in the enclosed space above the suspended ceiling where the fluorescent light fixture was located.
The evidence at trial demonstrated that the area sustaining the heaviest burn from the fire was the 2 x 10 inch wooden joists located in the concealed space above the suspended ceiling in the break room. That area also contained other combustible materials, including paper-backed insulation.
Based upon the evidence, including the testimony of expert witnesses, the burn pattern, the lack of heat detected by the thermal imaging camera, the fuel load, and the charring of wood shelving and nearby light combustibles and walls, the court finds that the fire originated above the ceiling at the fluorescent light fixture and not at the toaster oven. The court further finds that any heat damage to the toaster oven and the burn patterns in and around the toaster oven were caused by a secondary drop-down fire which resulted when the suspended ceiling collapsed after the fire in the wood floor joists had been burning for some time.
2. The Fluorescent Light Fixture
Richard Fain (“Fain”) was called as an expert witness by One Beacon. He testified that he had examined the fire scene on September 1, 1999, and took photographs. He then went to the Hanover Fire Department where he spoke with Captain Harrington and Captain Gallagher and examined both the fluorescent light fixture and photographs that had been taken by the Hanover Fire Department. On a later date, he returned to the Hanover Fire Department where he examined the toaster oven. Fain prepared three reports which summarized his findings. Fain opined that the fire was caused by an electrical event that occurred in the ceiling adjacent to the fluorescent light fixture which had been improperly installed.
In explaining his opinion, Fain testified that the wiring of the fluorescent light fixture consisted of armor-clad two-conductor BX cable that entered the fixture through an unprotected, knockout hole; that the armor cover to the BX cable ended outside of the fluorescent light fixture and the two wires that led into the fixture were left unprotected; that a required cable clamp was not used to secure the wiring against movement and abrasion from vibration of the floor joist above; and, that the wiring was not grounded inside the fluorescent light fixture by a proper entrance clamp or a ground wire to the internal screw connection.
Fain further testified that the fluorescent light fixture should not have been installed along the length of the floor j oist in the ceiling area because it prevented heat from escaping. This improper installation allowed long-term exposure and eventual carbonization of the wooden floor joists as a result of the heat generated by the fixture which lowered the ignition temperature of the wood. The carbonization did not cause the fire but did lower the joist’s ignition temperature. Beside being installed along the joist, the heat from the fluorescent light fixture was further prevented from escaping because of the tile floor above and the insulating materials in the suspended ceiling.
According to Fain, the first-floor area above where the fluorescent light fixture was installed was a heavily traveled atrium area containing a raised platform used by diners in the food court of the Mall. On August 10, 1999, insulation on the wires supplying electricity to the fixture broke down after 8 to 9 years of constant move *514 ment of the improperly anchored and non-grounded BX cable. When Gilligan turned on the fluorescent light on the morning of the fire, an electrical arc or high resistance discharge occurred within the wiring to the fixture which produced sufficient heat to ignite the surrounding combustibles. Because of the confined area, the fire smoldered for a considerable time in the ceiling area above the sprinkler heads before entering the area below and triggering the sprinklers.
The court accepts Fain’s testimony as to the cause of the fire on August 10, 1999.
B. Installation of the Fluorescent Light Fixture in the Break Room
Neither George P. Williams, who was formerly employed by Williamsburg, nor his father, Williams, has a clear memory of who installed the electrical service for the build-out. Although he had no paperwork relating to the build-out, Williams testified that he believed that Alibrandi was responsible for the installation. Alibrandi, however, expressed no uncertainly about the issue. She was adamant that, although she pointed out to Williams where the outlets and lights should be located, Williams-burg and not her or The Face Place was solely responsible for installation of the electrical service. Alibrandi testified that her only responsibility during construction of the build-out was some finish work, painting and decorating; that her son installed shelving and cubicles in the break room and assisted with the painting; and that she did not retain independent contractors to perform any construction work, including installation of electrical service or any other installation work. Alibrandi’s testimony was supported at trial by the testimony of Susan Stella, a fourteen-year employee of The Face Place, that Williamsburg was responsible for installing the electrical service. Alibrandi’s testimony was further supported by the testimony of Christopher Gallo (“Gallo”), an electrician who has done work for Williamsburg in the past and whom Williamsburg hired to correct electrical code violations found at the Mall after the fire. Gallo testified that other fluorescent light fixtures installed in common areas of the Mall under the control of Williamsburg exhibited the same type of installation as the fluorescent light fixture in the break room. The court finds the testimony of Alibrandi to be credible and that Williams-burg, and not Alibrandi and/or The Face Place, was responsible for the negligent installation of the fluorescent lighting fixture in the break room.[3] The commercial tenants, however, failed to establish that Williams was acting in his individual capacity rather than through Williamsburg regarding the build-out. As such, the court does not find Williams personally liable for the negligence.[4]
C. STATUTE OF REPOSE
Williamsburg argues that even if this court finds that defendants Williamsburg and/or Williams were responsible for the installation of the fluorescent light in the break room and that the fluorescent light was the cause and origin of the fire, then as a matter of law, recovery against Williamsburg and Williams is barred by G.L.c. 260, §2B, the Statute of Repose.[5]
G.L.c. 260, §2B provides “actions of tort for damages arising out of any deficiency or neglect in the design, planning, construction or general administration of an improvement to real property, . . . shall be commenced only within three years next after the cause of action accrues; provided, however, that in no event shall such actions be commenced more than six years after the earlier of the dates of: (1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner.”
“As a statute of repose, G.L.c. 260, §2B, precludes recovery against those within the protection of the statute for any injury which occurs more than six years after the performance or furnishing of the design, planning, construction, or general administration of an improvement to real property.” Klein v. Catalano, 386 Mass. 701, 702 (1982). “G.L.c. 260, §2B has the effect of granting immunity from suit only to architects, engineers, contractors, and others involved in the design, planning, construction, or general administration of improvements to real property and of denying that protection to suppliers, owners, tenants, and others in possession or control.” Id. at 715.
The Supreme Judicial Court has indicated that when there is a question about whether a defendant is entitled to repose, the first question to be answered is whether the defendant is an actor under G.L.c. 260, §2B. Dighton v. Federal Pacific Electric Co.; Sert, Jackson & Associates, Inc., 399 Mass. 687, 694 (1987). If that question is answered affirmatively, the next questions is whether the defendant’s acts are covered under the statute.[6] Id. The Supreme Judical Court has further stated that “(o]n its face, §2B defines the protected actor largely by reference to protected acts. The body of §2B names no class of protected actors. Rather, its terms extend protection to persons allegedly responsible for acts, i.e., those who commit ‘any deficiency or neglect in the design, planning, construction, or general administration of an improvement to real property.’ ” Id. Therefore, “application of the statute is necessarily dependent on the nature of the party’s activities.” Snow v. Harnischfeger Corp., 12 F.3d 1154, 1160 (1993) (citing Dighton as standing for the proposition that “the court must engage in an activities analysis when the defendant’s status as a protected actor is unclear”).
Here, there is a question as to whether Williams-burg is entitled to the protection of the statute of repose. Therefore, the first question to be addressed is whether Williamsburg is an actor under G.L.c. 260, §2B. “In considering whether an actor not clearly within the statute is entitled to repose, the court engages in a fact-based activities analysis. The court must consider the motivation of the actor in producing the improvement.” Id. (citations omitted). “(T]he Legis *515 lature, by enacting §2B, meant to protect providers of ‘individual expertise’ in the business of designing, planning, constructing, and administering improvements to real estate . . . §2B was intended ... to apply . . . only to the kinds of economic actor who perform acts of ‘individual expertise’ akin to those commonly thought to be performed by architects and contractors — that is to say, to parties who render particularized services for the design and construction of particular improvements to particular pieces of real property.” Dighton, Mass. at 696. In Klein v. Catalano, the Supreme Judicial Court discussed the reasoning behind G.L.c. 260, §2B as follows:
The Legislature could have rationally concluded that it was proper to place different time limits on the liability of builders from those placed on persons in possession or control as owner .. . There is a valid distinction between persons performing or furnishing the design, planning, supervision, inspection or observation of construction . . . and a person in possession or control, as owner ... of such improvement at the time of the incident giving rise to the cause of action ... It is difficult for the architect or contractor to guard against. . . occurrences because, after the acceptance by the owner, the architect or contractor ordinarily has neither control of the improvement nor the right to enter or inspect the improvement.
386 Mass. 701, 715-16 (1982).
Here, Williamsburg does not claim that it rendered any such particularized services with respect to design or construction of the break room. In fact, Williamsburg denies that it installed the fluorescent light fixture.
In support of its contention that it is protected by the statute of repose, Williamsburg cites Sonin v. Massachusetts Turnpike Authority, claiming that it “settles that an owner may rely upon the Statute of Repose to defend against a claim based upon the allegation that the owner participated in an act protected by the statute — i.e. the design, planning, construction, or general administration of improvements to real property...” The Court in Sonin said “an owner that participates in the design of improvements to real property is as entitled to the protection of §2B as any other actor involved in such design or construction— but only with respect to a claim for negligence in the design.” 61 Mass.App.Ct. 287, 289 (2004).[7] Therefore, as stated above, Williamsburg argues that to the extent the plaintiffs’ claim is based upon allegations that it negligently installed the fluorescent light, it is entitled to a directed verdict. The Appeals Court, however, has held that simply installing a boiler does not involve “the type of ‘design, planning, construction or general administration’ required by the statute of repose.” Colomba v. Filchini Plumbing, 58 Mass.App.Ct. 901, 902 (2003). “The focus on ‘individual expertise’ and ‘particularized services’ has remained constant in our decisions . . . While we can imagine situations where a plumber would perform more expanded services that might bring him within the statute of repose, the mere installation of a boiler, and nothing more, does not qualify.” Id. (citations omitted). Similarly, the installation of fluorescent lights does not involve the type of design, planning, construction or general administration required by the statute of repose. Because Williamsburg does not claim that it was involved in any other aspect of the fluorescent lights (e.g. design or planning), it is not a protected actor under and is not entitled to the protection of the statute of repose.[8]
D. DAMAGES
The parties to the consolidated actions have entered into a joint stipulation with respect to damages. Pursuant to the stipulation, should Merchants Mutual Insurance Company prevail as a plaintiff against Face Place, Inc. and WET, Inc., d/b/a Lightning Laundry the gross amount of its damage would be $287,758.14. In the event One Beacon Insurance Company prevailed in its claims against Williamsburg Company, Inc. and George D. Williams, the damages suffered by its various insureds totaled $434,106.70. It was stipulated that should Travelers Property Casualty Company prevail in its claims against Face Place, Inc., Williamsburg Company, Inc., George D. Williams and/or WET, Inc., d/b/a Lightning Laundry the damage suffered by its insureds was $60,976.29. These damages are exclusive ofinterest and costs and do not reflect deductions which might be made for comparative negligence or other potential set-offs. The parties further stipulated that the amounts reflected above were as a result of the fire at the Merchants Row Marketplace on August 10, 1999 and the sums were paid as a result of losses suffered by their respective insureds.
ORDER
For the reasons stated above, the court finds as follows:
A. Docket No. 00-558A— Second Amended Complaint
1. The court finds for Face Place, Inc. on Count I (Merchants Mutual v. Face Place, Inc. for Negligence).
2. The court finds for WJT, Inc. on Count III (Merchants Mutual v. WJT, Inc. d/b/a Lighting Laundry for Negligence).[9]
3. The court finds for Face Place, Inc. on Count III (Merchants Mutual v. Face Place, Inc. for Breach of Contract).
B. Docket No. 01-00014 — Complaint
4. The court finds for George D. Williams on Count I (One Beacon v. George D. Williams for Negligence).
5. The court finds for One Beacon on Count II (One Beacon v. Williamsburg Company, Inc. for Negligence).
6. The court finds for George D. Williams on Count III (One Beacon v. George D. Williams for Breach of Contract).
*516 7. The court finds for Williamsburg Company, Inc. on Count IV (One Beacon v. Williamsburg Company, Inc. for Breach of Contract).
8. The court finds for George D. Williams and Williamsburg Company, Inc. on Countv. [One Beacon v. George D. Williams and Williamsburg Company, Inc. on Breach of Implied Warranty of Habitability).
C.Docket No. 01-0014 — Third-Party Complaint
9. The court finds for WJT, Inc. on Count I (George D. Williams and Williamsburg Company, Inc. v. WJT, Inc. d/b/a Liqhtning Laundry for Contribution pursuant to G.L.c. 23IB).
10. The court finds for WJT, Inc. on Count II (George D. Williams and Williamsburg Company, Inc. v. WJT, Inc. d/b/a Lightning Laundry for Common Law Indemnification).
D. Docket No. 01-01346 — Complaint
11. The court finds for Face Place, Inc. on Count I (Travelers, as Subrogee of Accord Stationery v. Face Place, Inc. for Negligence).
12. The court finds for George D. Williams on Count II (Travelers, as Subrogee of Accord Stationery v. George D. Williams for Negligence).
13. The court finds for Travelers on Count III (Travelers, as Subrogee of Accord Stationery v. Williamsburg Company, Inc. for Negligence).
14. The court finds for Face Place, Inc. on Count III [sic] (Travelers, as Subrogee of The Toy Box v. Face Place, Inc. for Negligence).
15. The court finds for George D. Williams on Count v. (Travelers, as Subrogee of The Toy Box v. George D. Williams for Negligence).
16. The court finds for Travelers on Count VI (Travelers, as Subrogee of The Toy Box v. Williamsburg Company, Inc. for Negligence).
17. The court finds for George D. Williams on Count VII (Travelers, as Subrogee of Accord Stationery v. George D. Williams for Breach of Contract).
18. The court finds for Williamsburg Company, Inc. on Count VIII {Travelers, as Subrogee of Accord Stationery v. Williamsburg Company, Inc. for Breach of Contract).
19. The court finds for George D. Williams on Count IX (Travelers, as Subrogee of The Toy Box v. George D. Williams for Breach of Contract).
20. The court finds for Williamsburg Company, Inc. on Count X (Travelers, as Subrogee of The Toy Box v. Williamsburg Company, Inc. for Breach of Contract).
21. The court finds for George D. Williams on Count XI (Travelers, as Subrogee of Accord Stationery v. George D. Williams for Breach Implied Warranty of Habitability).
22. The court finds for Williamsburg Company, Inc. on Count XII (Travelers, as Subrogee of Accord Stationery v. Williamsburg for Breach Implied Warranty of Habitability).
23. The court finds for George D. Williams on Count XIII (Travelers, as Subrogee of The Toy Box v. George D. Williams for Breach Implied Warranty of Habitability).
24. The court finds for Williamsburg Company, Inc. on Count XIV (Travelers, as Subrogee of The Toy Box v. Williamsburg for Breach Implied Warranty of Habitability).
25. The court finds for WJT, Inc. on Count XV {Travelers, as Subrogee of Accord Stationery v. WJT, Inc. d/b/a Lightning Laundry for Negligence).
26. The court finds for WJT, Inc. on Count XVI (Travelers, as Subrogee of The Toy Box v. WJT, Inc. d/b/a Lightning Laundry for Negligence).
E.Docket No. 01-01346 — Cross Claim
27. The court finds for Face Place, Inc. on Count I [George D. Williams and Williamsburg Company, Inc. v. Face Place, Inc. for Contribution pursuant to G.L. c. 231B).
F.Docket No. 01-01346— Third-Party Complaint
28. The court finds for WJT, Inc. on Count I [George D. Williams and Williamsburg Company, Inc. v. WJT, Inc. d/b/a Lightning Laundry for Contribution pursuant to G.L.c. 23IB).
29. The court finds for WJT, Inc. on Count II [George D. Williams and Williamsburg Company, Inc. v. WJT, Inc. d/b/a Lightning Laundry for Common-Law Indemnification).
The parties shall prepare and submit a proposed judgment within thirty days which conforms to the court’s Order.

 In addition to those expert witnesses, Daniel Slovich also testified. Williamsburg originally retained Slovich, a fire investigator (“Slovich'’), to investigate the cause of the fire. Slovich examined the scene some two days after the fire and prepared a report. He was not called by Williamsburg, but One Beacon called him as a witness. Slovich opined that the origin of the fire was above the suspended ceiling and that the charred area around the toaster oven was caused by a drop down fire from above. He testified that he did not reach a conclusion as to whether the fluorescent light fixture caused the fire. However, he testified that screwing the fluorescent light fixture directly along the floor joist was a violation of the code since heat from the ballast or degradation could cause a fire; that there was no cable clamp which would have protected the wire as it went through the rough opening and would have acted as a strain relief; and that if the wire were pulled out, it could cause a short circuit and fire.

 A permit was not issued by the Town of Hanover for the electrical work done during the build-out. Williamsburg should have obtained the permit or insured that the contractor it engaged obtained one. Had a permit been issued by the Town, it is likely that the negligent installation of the fluorescent light fixture would have been discovered during a Town inspection and that the fire would not have occurred.

 Williamsburg argued at trial and in its papers that it did not have a duty to maintain the electrical systems in the Face Place. Under Massachusetts law, a lessor of commercial premises has a duty to keep the premises in a safe condition only if he undertakes to do so in the lease or if the location of the defect that caused the injury is in a common area over which the lessor had some control. Chausse v. Coz, 405 Mass. *517 264,266 (1989). Because of this court’s finding that Williams-burg negligently installed the fluorescent lighting fixture, the court will not address this issue except to note that there was no duty to maintain on the part of Williamsburg because there was no lease and it was not a common area over which Williamsburg had some control.

 Additionally, Williamsburg argues that The Face Place breached its lease by failing to name Williamsburg as an additional insured on its insurance policy as required by the lease. This court finds that the lease between Williamsburg and The Face Place had expired: therefore, The Face Place was a tenant at sufferance and there was no lease to breach.

 Ao answer this question, “the courts of this Commonwealth have focused their inquiry on whether the acts alleged to have caused injury were performed with respect to ‘improvement to real estate.’ ” Dighton, 399 Mass. at 695. To do this, the courts have used the definition of improvement found in Webster’s dictionary. Id. at 697. Improvement means “a permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs.” Conley v. Scott Products, Inc., 401 Mass. 645, 647 (1988). The court notes, however, that the definition of improvement is not useful in determining which actors were “intended to be comprehended by §2B.” Dighton, 399 Mass. at 697.

 While Sonin deals with the second paragraph of G.L.c. 260, §2B which applies specifically to public agencies and this case deals with the first paragraph of G.L.c. 260, §2B, the language analyzed by the court is the same in the first paragraph.

 Because Williamsburg is not an actor protected under G.L.c. 260, §2B, the court need not consider whether the fluorescent lights were an improvement to real property under G.L.c. 260, §2B.

 In its Requests for Findings of Fact and Rulings of Law, Merchants Mutual stated that it waived Count II for indemnification against Face Place, Inc.